Robert H. Phillips   (281) 499-0182
3223 Northpark Drive
Missouri City, Texas 77459

Police Instructor/Public Safety Consultant

Gail Dorn
P.O. Box 2364
Corpus Christi, Texas 78403

Dear Ms. Dorn:

This is my preliminary report regarding Eric Gonzales v. City of Corpus Christi, et al., Cause No. C-05-280. It is based on an analysis and evaluation of materials and documents you provided to me on 010606. Those are:

1. Plaintiff's Original Complaint;
2. Plaintiff's First Amended Original Complaint;
3. Defendant City of Corpus Christi's Original Answer;
4. Defendant Morrow's First Amended Original Answer;
5. Defendant Nueces County and Sheriff Olivarez Original Answer;
6. Defendants (Nueces County Deputies) Casares, Gomez, and Hinojosa (Supervisor);
7. Defendant Nueces County Deputy Escobedo's Original Answer;
8. Defendant Nueces County Deputy Garza's Original Answer;
9. Defendant Irma Cabrera [Jail Nurse] First Amended Answer;
10. Defendant HEB and Villarreal Original Answer;
11. Defendants Escobedo, Gomez, Casares, and Hinojosa, Motion for Summary Judgment;
12. Defendant Garza's Motion for Summary Judgment;
13. Defendants Nueces County and Sheriff Olivarez's Motion for Summary Judgment,
14. Appendix Exhibits A through J submitted by "County" defendants in support of their Summary Judgment,
15. Plaintiff's Response and Objection to the Deputies, Nueces County and the Sheriff's Motions for Summary Judgment,

EXHIBIT 40

16. Defendant Individual Deputies Escobedo, Gomez, Casares, and Hinojosa's Reply to Plaintiff's Objection and Response to Motion for Summary Judgment.
17. Plaintiff's Exhibits Volume I containing exhibits 1 through 30 controverting the summary judgment;
18. Court's Order Granting in Part and Denying in Part the "County" Summary Judgment Motions;
19. Defendant Corpus Christi Police Officer Morrow's Motion for Partial Summary Judgment;
20. Exhibits 2,3,and 4, submitted by Officer Morrow in support of his Summary Judgment;
21. Plaintiff's Response and Objection to Defendant Morrow's Summary Judgment;
22. Plaintiff's Exhibits Volume II containing exhibits 32 through 38 cotroverting Officer Morrow's Summary Judgment Motion;
23. Affidavit of Joey Martin
24. Deposition of Eric Gonzales
25. Photographs of Plaintiff's injuries;
26. Medical Treatment and expenses
27. Nueces County Jail Facilities Health Agreement;
28. Agreement between Nueces and City of Corpus Christi for jail facilities use;
29. CD from Nueces County Jail of video regarding Plaintiff's time at jail;
30. Documentation from Nueces County on Plaintiff, regarding this incident;
31. Internal Affairs Report
32. Records Relating to the incident
33. Records from prior detention at the Nueces County Jail;
34. Plaintiff's Mugshots from Nueces County Jail;
35. Nueces County response to interrogatory request for complaints regarding other incidents involving excessive force, etc.;
36. Table of Contents of Minimum Jail Standards Manual of Nueces County;
37. Table of Contents from Nueces County Sheriff's Department
38. Table of Contents from Nueces County Jail Operations Manual;

39. Table of Contents and Index of Policies and Procedures from City of Corpus Christi;
40. Officer Survival Training brochure on Mechanics of Arrest;
41. Portions from publication regarding the PR-24 Police Baton;
42. Portions from Monadnock Certification course on PR-24 Side-Handle Police Batons;
43. Christus Spohn Hospital.

After reviewing all of the above listed materials, my experience as a police officer, my experience as a police instructor; and specifically as an instructor in the Intermediate Use of Force Course mandated by TCOLEOSE for almost 20 years, it is my opinion that Mr. Gonzales's constitutional rights protected under the 4th, 5th, 8th, and 14th amendments were violated by the defendants in this case.

Specifically, Mr. Gonzales's right under the 4th amendment to be protected from unreasonable search and seizure was violated, his right to not be compelled to be a witness against himself, particularly in this incident where no criminal offense had occurred, under the 5th amendment was violated, his protection from cruel and unusual punishment in violation of his due process rights under the 14th Amendment as a pretrial detainee.

The defendants deny these allegations and a number of facts are, of course, disputed. However, the pattern in the materials provided to me is one of defendants denying plaintiff allegations, but not offering an explanation. For example, defendant Morrow states "a short struggle" took place when Mr. Gonzales was first taken into custody. No explanation is given as to what tactics were used during this short struggle and no explanation is offered as to how plaintiff sustained the number of injuries he received that are clearly depicted in photographs. My opinion being offered is based primarily on exhibits offered by the plaintiff and what limited information that could be taken from defendant's exhibits; and comparing what reasonably well trained officers would do in similar circumstances based on current training procedures. I will begin with the facts that are not in dispute by either party.

3

During the mid-afternoon of June 3rd, 2004, plaintiff, Eric Gonzales attempted to purchase a pack of cigarettes at a HEB grocery store in Corpus Christi. All of the law enforcement personnel who had contact with him on this date were on duty, in uniform, and acting under color of law.

There is agreement from both parties that a conflict arose between the plaintiff and an employee with HEB as a result of plaintiff being .28 cents short of the price for a pack of cigarettes. The plaintiff advised that in the past he had been allowed to go to his residence, which is a short distance from the store, and return with an appropriate amount of money to make a purchase if he didn't have an appropriate amount of money with him. On this date the clerk advised him he would have to have the entire amount before he could leave with the cigarettes. The plaintiff advised that he complied and left the store to obtain the rest of the money at his apartment. According to the Nueces County Field Arrest Report Affidavit by Officer Morrow the plaintiff, "causing a disturbance with the clerk, placing her in fear." The records do not indicate what the disturbance was, or why the clerk felt the plaintiff had placed her in this fearful position.

It is undisputed that plaintiff then exited the store. Another employee, believed to be Alfred Villareal, threatened to have the plaintiff arrested. After a short discussion, which included an explanation from plaintiff as to his intent, he was advised to buy his cigarettes at the kiosk located at the gas pumps in the parking lot. Plaintiff complied with these instructions and purchased a pack of cigarettes at the kiosk. Officers Morrow and Goce who are employed by the Corpus Christi Police Department contacted the plaintiff. It is undisputed that they received a radio dispatched call to this location. Corpus Christi police department records conflict as to what type of call the defendants were dispatched to. One document indicates they were dispatched to an unknown type of disturbance involving a male. Another document indicates they were dispatched to a criminal trespass call. What is known is that Officer Morrow contacted Mr. Villareal at the front of the store. None of the documents reveal what Officer Morrow was told by Mr. Villareal. It is known after a short conversation that Officer Morrow went to the gas pump area and made contact with the plaintiff.

Officer Morrow stated that plaintiff was agitated and loud. Plaintiff admits to being upset over how he had been treated at the store. It is undisputed that he had a right to enter the store and purchase a product. There was no notice that entry was not forbidden, nor did he receive notice to depart the premises. Both of these elements are required for a charge of criminal trespass to be filed. Notice is defined as an oral or written communication by the owner or someone with apparent authority to act for the owner. Mr. Villareal would have been the person with the authority to notify plaintiff that he had entered or remained on that property without his consent. Not only did this not take place, but Mr. Villareal gave him permission to remain on the property to purchase his cigarettes. It is not known why he first threatened to have the plaintiff arrested, or what charge he was considering filing. What is known is the plaintiff had consent to be on the property at the time of this incident, and he was not charged with criminal trespass. It is at this point that the defendants deny allegations made by the plaintiff.

In an incident such as this an expert consultant forms an opinion based on the materials and documents provided whether or not if what the officers involved did was not only legal, but also if their actions meet a reasonable standard of performance based on commonly accepted training procedures.

While officers are en route to a call, a reasonable well-trained officer is considering 3 factors while en-route. The first consideration is whether or not the call is valid. The second consideration is whether the crime is still taking place or not. The third consideration is whether a suspect is still on the scene or not.

These considerations are from a book and subsequent training course entitled, ***The Tactical Edge,*** authored by Charles Remsberg. Based on records provided this is a course taught to Corpus Christi police officers. I did not view any training records, so I assume the initial responding officers had received this training prior to this incident.

If Morrow had been advised by Villareal that the plaintiff did not have consent to be on the property one could conclude that Morrow believed the crime of criminal trespass was still occurring. However, the plaintiff was not charged with

that offense. If Villareal pointed out plaintiff to Morrow he knew plaintiff was still on the scene, which answered the third consideration.

Based on the materials provided to me it appears the initial call was to investigate criminal trespass complaint, or a disturbance involving the plaintiff. However, in the materials I analyzed Morrow advised that the first offense the plaintiff committed was "failure to identify."

It is important to establish what offense the officers were investigating in light of the fact that force was used to take Mr. Gonzales into custody. It is important because officers are justified in using reasonable force only under two circumstances. The first is to control an arrest situation and the other is in defense of self or a third party. The primary consideration as to what level of force is employed by an officer is based on whether a suspect is being compliant, or resistive.

The landmark Supreme Court decision in **Garner v. Tennessee** determined that the use of force employed by a police officer against a citizen was a seizure. Their opinion was that people had the right to be free from unreasonable seizure. Whether a particular seizure is constitutionally unreasonable depends upon the factual circumstances. The court ruled that, "one must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests alleged to justify the intrusion."

Again, it appears that the governmental interests in this matter were limited, if any. The other Supreme Court case that applies in this instance is **Graham v. Connor.** The court ruled that an officer's performance must be evaluated on what the officer knew at the time, and comparing that performance to what other reasonable officers would do in the same or similar circumstances. The defendants offer little explanation.

We do know that charges were not filed relating to criminal trespass or a disturbance. For that reason I can only comment on the actual use of force employed.

Addressing using force to control an arrest situation first, Morrow states that plaintiff was agitated and difficult. Officers must communicate with others under

different circumstances than many people. Most people respond positively to reasonable requests from an officer, but frustrated people often resist. Upset people are often incapable of acting reasonably. Officers are taught in the Intermediate Use of Force course that they should employ a strategy that redirects behavior of difficult people to generate voluntary compliance if no immediate threat exists. One does this by maintaining objectivity, allowing people to express their frustration, and listening to them. That is important, because it allows the officer to respond to the situation rather than reacting. It will help prevent the officer from taking things personally. This is important, because an officer must employ force based on actions rather than words. Words alone are not a threat. These are the standards of performance of a reasonable and well-trained officer. This does not appear to have taken place in this situation. While defendant acknowledges that plaintiff was upset and agitated there appeared to be no attempt to determine why. It appears a rather heavy-handed approach was used in trying to determine what had taken place. For example, it is stated that they were going to conduct a *Terry* frisk. This refers to the Supreme Court decision that allows officers to pat someone down in the course of an investigation for weapons. Defendant had a legal right to do this, and it would be the prudent thing to do. However, as upset and agitated as plaintiff is alleged to have been the officer should have recognized that something had happened prior to his arrival, or there was another contributing factor. People with certain handicaps, or mentally unbalanced will react in a similar fashion. One tactic that often helps in this situation is to set context. What I mean is if defendant had taken a brief moment to explain to plaintiff what they were doing and why this entire incident could possibly have been prevented. However, according to the affidavit of Joey Martin plaintiff was 'thrown' on the hood of the patrol car shortly after the officers arrived. At this point in the contact it has not been established by the officers that any criminal offense has been committed.

 Morrow advises that the first offense the plaintiff committed was "failure to identify." In Chapter 38.02 of the Texas Penal Code subsection (a) it states, "A person commits an offense if he intentionally refuses to give his name, address, or

date of birth to a peace officer who has lawfully arrested the person and requested the information."

It is obvious this element wasn't met for two reasons. First is that the plaintiff didn't refuse to identify himself, but simply told them he didn't have an I.D. The second element wasn't present, because at the point he was asked to identify himself wasn't incident to a lawful arrest. The officers were merely conducting a field interview to determine what, if any criminal offense had been committed. This is corroborated by the fact that the plaintiff was not charged with failure to identify; as well as by the fact that he was charged with a Class C misdemeanor failure to appear warrant. This could not have been done unless he had provided officers with his identify because he does not possess a driver's license, or I.D. card.

He also wasn't charged with criminal trespass, or disorderly conduct as a result of what they had discovered pertaining to a disturbance, so one must conclude that force was not employed to control an arrest situation.

That would mean force was employed to defend them. Morrow states that plaintiff repeatedly reached to his waistband area. This statement is made later, because initially in the Nueces County Field Arrest Report Affidavit there is no mention of this being the reason force was employed, but I will address this point anyway.

In the materials I received was a video- tape taken at the Nueces County jail. In the copy provided to me labeled 1A)40037-7 the plaintiff is clearly seen pulling his pants up several times. What is significant in this tape is one can clearly see his hands are somewhat curled in order to grab his pants. This contradicts Morrow's statement that at the scene he interpreted plaintiff's movements as potentially threatening. The reason being is that when a suspect reaches for a weapon at least part of the palm is visible. In other words the hand is extended more than curled in order to procure a weapon. Based on Morrow's statements he and Officer Goce were in a position to observe the hands of the plaintiff. A reasonable well-trained officer would recognize that what the plaintiff did was not threatening, which would result in the force employed being

8

unnecessary. By definition that would mean it was unreasonable and excessive, in violation of the 4th amendment to the Constitution. One must conclude that a proper threat assessment was not made.

In the *Tactical Edge* training Corpus officers attend proper threat assessment is one of the topics covered. Remsberg states, "Thinking tactically involves the assessment of potential dangers that one may encounter. In order to make the proper assessment of a situation one has to be able to organize incoming information and evaluate it in a speedy and efficient manner." I submit this was not done at the scene.

However, I also evaluated the officer's performance based on the possibility that he misinterpreted the threat, recognizing we demand, rightly, that officers perform to a standard of excellence, but not perfection. In other words I assumed that Officer Morrow actually interpreted plaintiff's movements as threatening.

Remsberg's training also discusses an officer's "Focus Point." He points out that a clear and present threat must be immediately controlled. The focus point refers to whether an officer is focused on the person, or the weapon. The focus is dictated by time and distance. This also brings into play an analysis of tactics. An officer employing force must make the determination of whether the tactic chosen will control the offender's movements. Remsberg accurately concludes that whatever tactic is chosen should culminate in control. The Intermediate Use of Force course covers the same topic emphasizing that an officer must exert control to take a suspect safely into custody. Implicit in this however, is that control is a "two-way street." An officer must also exert self-control in able to control a violator. It appears this was not done based on the following.

Based on the affidavit of Joey Martin, a witness to this incident, it appears Morrow had his baton out early in the contact with plaintiff. Martin's statement was that plaintiff pulled up his pants and was struck repeatedly with the baton. He said, "Eric didn't do anything against the police officers. He didn't raise his hands or arms. He didn't back away from them. He didn't do anything that looked like he was trying to get away or pull away or fight the officer." One can suggest that a 9 year old wouldn't interpret a potential threat the same as a reasonable well-

trained officer. The bottom line is this. If Morrow misinterpreted the potential threat created by the plaintiff pulling up his pants and genuinely believed he was reaching for a weapon then his focus point would have been on the weapon due to the close proximity between him and plaintiff. In other words he should have struck the plaintiff in the forearm, which would have resulted in it being incapacitated and neutralizing any weapon he was reaching for. This is a significant point, because officers are taught that a blow that is not incapacitating to the suspect allows the weapon to remain a threat to the officer. Joey Martin stated that plaintiff was struck several times to the back and head. Photographs corroborate his statement.

Some of the documents provided to me were information relating to training Corpus Christi officers receive in the Monadnock PR-24 side handle baton. In this material it is clearly stated that officers should not ever strike a suspect above the shoulders unless they are justified in employing deadly force. This is because that strike is intended to result in serious bodily injury or death to the suspect. By law and departmental policy officers are only allowed to employ deadly force when they believe their life or the life of a third party is threatened by seriously bodily injury or death. Morrow alleges this was the situation. What I am pointing out however, is that if that were true the correct strike would have been to the forearm of the plaintiff to render the arm incapable of employing a weapon. Joey Martin's statement was after plaintiff was taken into custody, "we saw Eric after all of this happened and his face and head had cuts on them and his eye was swollen." Photographs of the plaintiff corroborate this statement. This indicates the strikes were random, out of control, and no assessment made as to their effectiveness, or appropriateness. This suggests that the force employed was punitive and retaliatory in nature. The action appears to be intentional as Morrow acted with reckless disregard for the probable consequences of his actions. He is required to have training in the use of force, and specifically in the employment of the PR-24 side-handle baton. He did not employ the baton in a proper manner against Mr. Gonzales.

In use of force training officers are taught that an officer has the potential to reduce the problems and danger associated with physical arrest if he is firm but fair with an individual. Emotional reactions are often the direct result of uncertainty, which is likely to result in compensating behavior. One of the forms of compensating behavior is unnecessary, or excessive force. Every encounter an officer has he must be firm and prepared to protect himself and others, but the force employed must be controlled and used with a purpose. Only a reasonable amount of force is authorized to control an arrest situation, or defend himself, or a third party. Based on the materials provided to me neither situation existed at the HEB parking lot on the day of June 3rd, 2004. Again, this would be a 4th Amendment violation to the Constitution protecting individuals from excessive force under protection to an unreasonable seizure.

The other defendants in this cause are employees of the Nueces County Sheriff's Department. A number of lower court cases have concluded that municipal police agencies are ministerial as opposed to being discretionary. They have ruled that if a governmental entity is going to have a police they have an affirmative duty, among others, to train their employees. Later other court rulings have been ruled that Sheriff's departments have the same affirmative duty.

I was provided with the Table of Contents of Rules and Policy Manuals for both Corpus Christi police department and Nueces County Sheriff's department as well as the Table of Contents of Minimum Jail Standards Manual for Nueces County. It appears based on that material that the Nueces County defendants have received training in the role their agency's written directives have in their liability. However, based on what I was provided it would appear these directives were not followed.

The considerations for detention personnel's use of force are a little different than line officers. Force to control an arrest situation wouldn't apply as the people they are dealing with have already been arrested. Their employment of force is to maintain control in the detention facility and/or in defense of themselves or a third party. That is the same as it applies to line officers. 4th Amendment standards are applicable in this setting as well as 14th Amendment considerations

relating to cruel and unusual punishment without due process. In evaluating the need for force employed against the plaintiff by these defendants I had only the videotape that I referred to earlier in this report. There was no audio that accompanied the tape. The primary part of the tape that is applicable to this case was again 1A040037-7.

In this segment one can view the plaintiff apparently upset and agitated. This is based on viewing him kick the door to the cell he is in, and when he exhibits his middle finger to someone out of view. He later is observed slamming the phone receiver against the base of the telephone in the cell he was in. At this point one can see the door open and the Nueces County defendants enter the cell. Since there is no audio one can't determine if verbal commands have been given or what their objective is in entering the cell.

In reading the plaintiff's deposition the attorneys for the defendants placed a great deal of emphasis on the language the plaintiff allegedly used, and his general difficult demeanor. Defendants know through training that mere language and gestures does not justify the employment of force. However, reasonable well-trained law enforcement personnel recognize that type of behavior is an indication of something else. In none of the materials I was provided was it ever indicated that any of the defendants ever attempted to determine what was causing the plaintiff to be so difficult. It is not unusual of course for someone to not be pleased about being arrested. However, the agitated and upset state of mind that defendants allege was consistently displayed by plaintiff is uncommon without some type of outside influence. By that I mean this kind of behavior is generally due to having ingested some type of substance, or due to some type of mental unbalance. It appears based on the materials and documents provided to me that this was never done.

The tape reveals that the door to the plaintiff's cell opens and jail personnel enter the cell. One can clearly see that the first detention officer is holding a pair of handcuffs. The plaintiff immediately walks to a wall and places his hands upon it. At this time he is swarmed and taken to the concrete floor and placed in a prone position. It is difficult to judge based on the camera angle, but it appears

while he is being handcuffed his head is being repeatedly struck against the hard surface. That is the only movement one can observe indicating the plaintiff was not resisting their efforts to handcuff him. What is known is that the plaintiff lost two teeth at some point he was in custody at the jail. Later video clearly reveals blood on his mouth, face, and clothing. The video doesn't provide the names of specific defendants in this matter, but the one that appears to be banging plaintiff's head against the hard surface is the bald detention officer that enters the cell. Supervisors and non-supervisory personnel have an affirmative duty to intervene in stopping officers who are engaging in excessive force in their presence. This was not done at this point in time, nor was it done at the original scene when defendant Morrow struck the plaintiff with his baton numerous times.

There are a number of considerations in determining what specific level of force is to be employed by law enforcement personnel. The primary consideration all personnel is taught in making this determination however is based on whether the person is being compliant, or being resistive. With the exception of pulling up his pants at the scene it is never established that the plaintiff offered any resistance to any of the defendants during this entire incident.

During the initial contact defendant Morrow alleges that there was resistance but it is never elaborated on. The affidavit of Joey Martin however, directly contradicts Morrow's account.

In the jail plaintiff is observed placing his hands on the wall. It is unknown if this is in compliance with verbal commands, or he took it upon himself to do it to avoid what ultimately occurred to him anyway.

At the scene and in the jail both instances of force appear to be punitive and retaliatory in nature. Attorneys for the defendants suggest plaintiff's actions justify the use of force that was employed against him, but the courts have consistently ruled that words without actions cannot be perceived as a threat; and therefore any force employed on that basis is unreasonable and excessive.

There is an indication that a pattern exists that either both departments fail to provide training for their officers, or training is provided, but compliance with training standards are not enforced. If provided with further information in the

future I will be able to make a better determination as to which condition is more accurate.

Based on my analysis of the documents and materials provided to me I would conclude that the plaintiff's allegation that his rights afforded to him by the 4th, 5th, 8th, and 14th Amendments to the Constitution were violated.

Respectfully submitted,

/s/ Robert H. (Tim) Phillips
   01/11/06